## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. Steven C. Mannion |
| v. | : Mag. No. 13-6085 (SCM) |
| KETANKUMAR MANIAR, <br> a/k/a "Ketan Maniar" | : **CRIMINAL COMPLAINT** <br> : **FILED UNDER SEAL** |

I, Laurie A. Allen, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Laurie A. Allen, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

June 4, 2013                              at          Newark, New Jersey
Date                                                   City and State


Honorable Steven C. Mannion
United States Magistrate Judge                    _____
Name and Title of Judicial Officer               Signature of Judicial Officer

1

## ATTACHMENT A

In or about May 2013, in Bergen County, in the District of New Jersey, and elsewhere, defendant

**KETANKUMAR MANIAR,**
a/k/a "Ketan Maniar,"

with the intent to convert trade secrets related to a product used in and intended for use in interstate and foreign commerce, namely a disposable pen injector developed by Becton, Dickinson and Company ("BD") for pharmaceutical and healthcare applications, and with the intent to convert said trade secrets to the economic benefit of anyone other than BD, and intending or knowing that the offense will injure BD, did knowingly steal, and without authorization appropriate, take, carry away, and conceal such information, or attempt to do the same.

In violation of Title 18, United States Code, Sections 1832(a)(1) and 1832(a)(4) and Section 2.

## ATACHMENT B

I, Laurie A. Allen, a Special Agent with the Federal Bureau of Investigation ("FBI"), having conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause:

### Becton, Dickinson and Company and its Trade Secrets

1. Becton, Dickinson and Company ("BD") is a global medical technology company with worldwide headquarters in Franklin Lakes, New Jersey. BD manufactures and sells various medical supplies, devices, laboratory equipment, and diagnostic products.

2. Through investment in research and development, BD is among the world's leading suppliers of medical devices and has remained a leading innovator in injection- and infusion-based drug delivery since 1906, when BD built the first-ever facility in the United States to manufacture needles and syringes. It is critical to BD's success that its research and development for its future products remain secret. BD's competitors could benefit greatly from this secret knowledge by learning what products BD is developing or using as part of its ongoing efforts to develop products to reduce the spread of infection, enhance diabetes treatment, and advance drug delivery.

3. BD takes many steps to protect its trade secrets[1] and its confidential and proprietary information. Among other things, BD requires employees to sign, as a condition of their employment, an Employee Agreement and attached Trade Secret Policy (collectively, the "Employee Agreement"), pursuant to which each BD employee agrees to refrain from disclosing any confidential information to third parties and from using any such information for personal purposes. In addition, BD specifically requires that its employees agree that they will protect BD's trade secrets, and that they will assign, to BD, any rights in any inventions or research conducted or developed while employed at BD.

4. BD also repeatedly informs and reminds its employees on an ongoing basis of the confidential and propriety nature of its business and product development by requiring employees to participate in its annual web-based security and confidentiality training.

---

[1] Trade secrets are defined under 18 U.S.C. § 1839(3), in relevant part, as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing," with respect to which "the owner thereof has taken reasonable measures to keep such information secret; and . . . the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public[.]"

5. BD restricts physical access to its Franklin Lakes, New Jersey facilities – as well as other facilities – and requires visitors to register with security and obtain authorization from BD personnel to enter the facilities.

6. BD also restricts access to its computer systems, by maintaining advanced computer security systems and requiring the entry of a user name and password to gain access to BD's electronic system containing, among other things, trade secret, confidential, and proprietary information.

7. BD maintains a secure document management system, which serves as the secure repository for BD's manufacturing, production, and development process documents, including documents containing and/or pertaining to BD's trade secrets.

8. BD allows employees to access BD's computer system while off-site, but only through BD's virtual private network ("VPN"), which uses encryption, security software, and other security devices to ensure that only authorized users can access BD's network remotely.

### Defendant KETANKUMAR MANIAR and BD

9. Defendant KETANKUMAR MANIAR, a/k/a "Ketan Maniar," ("MANIAR") is an Indian national who resided in Mahwah, New Jersey until on or about May 31, 2013. Defendant MANIAR was employed by BD, at a Franklin Lakes, New Jersey facility, as a Staff Engineer, from in or about February 2012 until his resignation on or about May 24, 2013. At BD, defendant MANIAR worked in a group responsible for manufacturing drug delivery syringes and pen injectors.

10. At the commencement of his employment with BD, defendant MANIAR countersigned, electronically on or about February 5, 2012 and in ink on or about March 2, 2012, an employee acknowledgement and agreement form relating to his receipt of the BD Code of Conduct, which discusses, among other things, the protection of BD's confidential business information and the appropriate use of BD information technology. Defendant MANIAR signed that he understood that compliance with the BD Code of Conduct was a condition of his employment, and therefore violation of the Code could result in termination of his employment and other disciplinary action.

11. By electronic signature on or about February 5, 2012 and in ink on or about March 5, 2012, defendant MANIAR also signed a BD "Employee Agreement." By the terms of the Employee Agreement, defendant MANIAR acknowledged and agreed that any confidential information to which he had access was the property of BD and would not be used or disclosed to others without BD's consent.

12. Specifically, defendant MANIAR agreed, in substance and in part:

not to use, for [him]self or on behalf of others, or disclose, either during [his] employment or thereafter, any confidential, proprietary, non-public information, whether of a technical or non-technical nature, about the business, technology, products and/or customers of BD, or about [his] activities as an employee of BD,

4

which was obtained or acquired by [him] during the term of [his] employment with BD ("Confidential Information"), unless authorized beforehand in writing by BD.

13. Under the Employee Agreement, defendant MANIAR further agreed "to comply with all applicable policies of BD, including, but not limited to, the Trade Secret Policy (copy attached)." The Trade Secret Policy provided to defendant MANIAR mandates that "BD trade secrets may be disclosed outside of BD only in connection with a legitimate business purpose. In that case, BD trade secrets may only be disclosed outside of BD under the protection of a CDA [confidential disclosure agreement] prepared or approved by the BD Law Group and signed by the intended recipient of the BD trade secret[.]"

14. By the terms of the BD Employee Agreement, defendant MANIAR also agreed, in substance and in part, that:

> upon termination of [his] employment with the Company, [he] shall promptly deliver to the Company all documents, including such things as drawings, manuals, notebooks, reports, customer and vendor lists, all samples, all prototypes, all assays, all demos, and like material, and anything else owned by the Company or to which the Company is entitled and which is in [his] possession or under [his] control, including, but not limited to, electronic versions of all such documents, and shall delete all such materials from the hard drive or digital storage media of all computers and electronic storage devices[he] use[s] that do not belong to the Company. [He] understand[s] and agree[s] that [he is] not authorized to use or access the Company's computer systems at any time for personal gain or for the benefit of any third party without the express written authorization of the Company.

15. At the bottom of the Employee Agreement, defendant MANIAR signed and dated his name – first electronically on or about February 5, 2012 and in ink on or about March 5, 2012, acknowledging: "This Agreement has been read and understood by me."

### Defendant's Theft of BD Trade Secrets

16. Defendant MANIAR began his employment with BD in or about February 2012. As a member of BD's group responsible for manufacturing prefillable syringes and pen injectors, defendant MANIAR had access to BD Trade Secret Information related to the development of such products, including a self-administered, disposal pen injector still under development by Company and not yet released for commercial sale (the "Disposable Pen"). Specifically, defendant MANIAR was primarily responsible for working with external vendors on the molding of the Disposable Pen.

17. Through an internal investigation, BD representatives discovered that, in or about May 2013, while still employed by BD, defendant MANIAR downloaded approximately 8,000 BD files containing, among other things, BD Trade Secret Information related to the Disposable Pen, onto multiple computer storage devices, including external hard drives and thumb drives (the "Suspicious Download Activity"). Most of defendant MANIAR's

5

Suspicious Download Activity occurred between on or about May 5, 2013 and on or about May 24, 2013, the same day that defendant MANIAR resigned from BD. BD representatives further learned that on or about Thursday, May 23, 2013, a day on which defendant MANIAR had called in sick and did not report to work, defendant MANIAR was busily downloading BD files using his mobile work laptop.

18. BD representatives also determined that defendant MANIAR transferred to himself, via email, certain BD files containing BD Trade Secret Information and/or confidential information. Specifically, on or about Thursday, May 16, 2013 at approximately 11:34 a.m., shortly before resigning from BD, defendant MANIAR forwarded to one of his personal email accounts a May 7, 2013 email that he had sent from his BD email account to BD personnel, which attached approximately sixty documents containing BD Trade Secret Information and/or confidential information related to, among other things, the Disposable Pen.

19. The numerous documents containing BD Trade Secret Information downloaded by defendant MANIAR collectively constitute a veritable tool-kit for mass producing the Disposable Pen. These trade secrets downloaded by defendant MANIAR include, but are not limited to, the following:

a. Picture-by-picture steps of how to assemble the Disposable Pen, along with design and pictorial information about the equipment used to assemble the product.

b. Product design-related files.

c. Reports and data outlining the Disposable Pen's design verification, which is extremely critical to obtaining regulatory approval, in the United States and abroad, for the product.

d. Schedules detailing BD's maximum build capacity for the Disposable Pen – i.e., the volume of Disposable Pens that BD can make per day and per year, which is valuable information for competitors.

e. Invoices related to the molds and assembly equipment for the Disposable Pen, which includes vendor information and pricing.

20. The BD Trade Secret Information that defendant MANIAR misappropriated is economically valuable to the defendant, whether to use directly himself in setting up a new business, for marketing himself for future employment, and/or for selling to BD competitors.

21. On or about June 3, 2013, the FBI conducted a court-authorized search of the New Jersey hotel room where defendant MANIAR was staying pending his relocation to India and his rental car. During the execution of the search warrant for defendant MANIAR's hotel room, agents seized, among other things, several computers and computer storage devices, including two external hard drives which BD representatives have confirmed are two of the very same hard drives that defendant MANIAR used to download files containing BD Trade Secret Information and/or confidential information (the "Hard Drives"). FBI agents, who are in the

process of reviewing the Hard Drives, have confirmed that at least one of the Hard Drives contains BD files with what appear to be BD Trade Secret Information and/or confidential information. Indeed, one of the BD documents on this Hard Drive is labeled, in the footer of each page, in substance and in part: "Company Confidential."

22. During the execution of the search warrants, defendant MANIAR confirmed, in substance and in part, that he is relocating to India, in two days. The investigation also has revealed that defendant MANIAR may plan to use the BD Trade Secret Information to obtain employment in India. During the execution of the search warrant for defendant MANIAR's hotel room, agents seized a CD on which is saved a copy of defendant MANIAR's resume. In addition, BD representatives have discovered that, in the weeks leading up to his resignation from BD on or about May 24, 2013, defendant MANIAR downloaded, from and/or through his BD work computer to a computer storage device(s), documents with filenames including the words "resume," "cover letter," and/or "thank you letter."

23. During the execution of the search warrant for defendant MANIAR's hotel room, federal agents also seized an Entrepreneurial Finance book from defendant MANIAR's hotel room, in which are flagged, notated, and/or underlined text related to calculating corporate revenues, starting corporate ventures, obtaining venture capital, and protecting intellectual property through trademarks, patents, and other means.

24. BD estimates the cost associated with developing the BD Trade Secret Information misappropriated by defendant MANIAR to be in the millions of dollars.