SUE/2013R00623

RECEIVED

MAY 2 8 2014

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| v. | : | Criminal No. 14- 291 (JAP) 01 |
| | : | |
| KETANKUMAR MANIAR | : | 18 U.S.C. § 1832(a)(1) |
| a/k/a "Ketan Maniar" | : | 18 U.S.C. § 1832(a)(4) |

# INFORMATION

The defendant having waived in open court prosecution by

indictment, the United States Attorney for the District of New Jersey charges:

## COUNT ONE
### (Theft of Trade Secrets)

### Background

1.    At all times relevant to this Information, unless otherwise stated:

### The Defendant

a.    Between in or about February 2012 and in or about May

2013, defendant KETANKUMAR MANIAR, a/k/a "Ketan Maniar," ("MANIAR"), an

Indian national, resided in Mahwah, New Jersey.

b.    Starting at least as early as in or about November 2004 and

continuing through in or about May 2013, defendant MANIAR worked for

multiple medical technology firms in the United States, including Becton,

Dickinson and Company ("BD"), in Franklin Lakes, New Jersey, and C.R. Bard,

-1-

Inc. ("BARD"), in Salt Lake City, Utah.

         c.     As early as in or about October 2012 and while still employed by BD in New Jersey, defendant MANIAR formulated a plan to start his own medical device manufacturing company in his home country of India, with an intent to form the company sometime in or about 2013.

<u>BD and BARD</u>

         d.     BD was a global medical technology company with worldwide headquarters in Franklin Lakes, New Jersey.  BD manufactured and sold various medical supplies, devices, laboratory equipment, and diagnostic products, and was an innovator in injection- and infusion-based drug delivery.

         e.     BARD was a global medical technology company with headquarters in Murray Hill, New Jersey and major divisions in other cities, including Salt Lake City, Utah.  BARD was a developer, manufacturer, and marketer of vascular, urology, oncology and surgical specialty products.

         f.     It was critical to the success of BD and BARD that their respective research and development for future products remained secret.  Both BD and BARD took many steps to protect their trade secrets and their confidential and proprietary information, including but not limited to the following:

         (i)     In the case of BD, requiring employees to sign, as a condition of their employment, an Employee Agreement and attached Trade Secret Policy (collectively, the "BD Employee Agreement"), pursuant to which

each BD employee agreed to refrain from disclosing any confidential information to third parties and from using any such information for personal purposes. In addition, BD specifically required that its employees agree that they would protect BD's trade secrets, and that they would assign, to BD, any rights in any inventions or research conducted or developed while employed at BD;

(ii)    In the case of BARD, requiring employees to sign, as a condition of their employment, an Agreement Relating to Inventions, Trade Secrets, and Confidential Information with Covenant Not to Compete (the "BARD Trade Secrets Agreement"), pursuant to which each BARD employee agreed, among other things, not to utilize any BARD trade secrets or confidential information for personal use or the use of others, during or following termination of employment. In addition, BARD employees agreed that they would assign, to BARD, any rights in any inventions or research conducted or developed while employed at BARD;

(iii)    Requiring employees to participate in annual security and confidentiality training;

(iv)    Restricting physical access to each of their facilities, including the facilities where defendant MANIAR was employed, and requiring visitors to register with security and obtain authorization from company personnel to enter the facilities;

(v)    Restricting access to their computer systems, by maintaining advanced computer security systems and requiring the entry of a

user name and password to gain access to the company's electronic system containing, among other things, trade secret, confidential, and proprietary information;

(vi)  Maintaining a secure document management system, which served as the secure repository for each company's manufacturing, production, and development process documents, including documents containing and/or pertaining to company trade secrets; and

(vii) Allowing certain employees to access their computer systems while off-site through each company's virtual private network ("VPN"), which used encryption, security software, and other security devices to ensure that only authorized users could access the company's network remotely.

<u>Defendant MANIAR's Employment at BD</u>

2.      Between in or about February 2012 until his resignation on or about May 24, 2013, defendant MANIAR was employed as an engineer at BD's Franklin Lakes, New Jersey facility, in a group responsible for manufacturing drug delivery syringes and pen injectors.

3.      At the commencement of his employment with BD, defendant MANIAR countersigned, electronically on or about February 5, 2012 and in ink on or about March 2, 2012, an employee acknowledgement and agreement form relating to his receipt of the BD Code of Conduct, which discussed, among other things, the protection of BD's confidential business information and the appropriate use of BD information technology.   Defendant MANIAR signed that

he understood that compliance with the BD Code of Conduct was a condition of his employment, and therefore violation of the Code could result in termination of his employment and other disciplinary action.

4.    By electronic signature on or about February 5, 2012 and in ink on or about March 5, 2012, defendant MANIAR also signed BD's Employee Agreement.   By the terms of the Employee Agreement, defendant MANIAR acknowledged and agreed that any confidential information to which he had access was the property of BD and would not be used or disclosed to others without BD's prior consent.

5.    By the terms of the BD Employee Agreement, defendant MANIAR also agreed, in substance and in part, that:

> upon termination of [his] employment with [BD], [he] shall promptly deliver to [BD] all documents, including such things as drawings, manuals, notebooks, reports, customer and vendor lists, all samples, all prototypes, all assays, all demos, and like material, and anything else owned by [BD] or to which [BD] is entitled and which is in [his] possession or under [his] control, including, but not limited to, electronic versions of all such documents, and shall delete all such materials from the hard drive or digital storage media of all computers and electronic storage devices[he] use[s] that do not belong to [BD].   [He] understand[s] and agree[s] that [he is] not authorized to use or access [BD's] computer systems at any time for personal gain or for the benefit of any third party without the express written authorization of [BD].

6.    At the bottom of the Employee Agreement, defendant MANIAR signed and dated his name – first electronically on or about February 5, 2012 and in ink on or about March 5, 2012, acknowledging:   "This Agreement has been read and understood by me."

-5-

## Defendant MANIAR's Theft of BD Trade Secrets

7.    As a member of BD's group responsible for manufacturing prefillable syringes and pen injectors, defendant MANIAR had access to BD trade secret information related to the development of such products (collectively, the "BD Trade Secret Information"), including BD Trade Secret Information related to a self-administered, disposable pen injector still under development by BD and not yet released for commercial sale (the "Disposable Pen").   Specifically, defendant MANIAR was primarily responsible for working with external vendors on the molding of the Disposable Pen.

8.    In or about May 2013, while still employed by BD, defendant MANIAR downloaded approximately 8,000 BD files containing, among other things, BD Trade Secret Information related to the Disposable Pen, onto multiple computer storage devices, including external hard drives and thumb drives. Defendant MANIAR downloaded most of this BD Trade Secret Information between on or about May 5, 2013 and on or about May 24, 2013, the same day that defendant MANIAR resigned from BD.

9.    On or about May 16, 2013, defendant MANIAR used his BD email account to forward to his personal email account, numerous documents containing BD Trade Secret Information and/or confidential information related to, among other things, the Disposable Pen.

10.    In addition, on or about May 23, 2013, a day on which he called in sick and did not report to work, defendant MANIAR instead downloaded BD files

using his mobile work laptop.

11.     As late as on or about June 3, 2013, approximately two days prior to his planned relocation to India, defendant MANIAR had in his possession, among other things, BD files containing BD Trade Secret Information and/or confidential information, which defendant MANIAR had stored on at least one external hard drive.   Defendant MANIAR maintained the external hard drive, along with several computers, computer storage devices, and other items, in a New Jersey hotel room where defendant MANIAR was staying prior to his impending relocation to India.

12.     The BD Trade Secret Information that defendant MANIAR misappropriated and had in his possession in his New Jersey hotel room was economically valuable to defendant MANIAR, whether to use the trade secrets in connection with his plans to start his own medical technology firm upon his return to India, for marketing himself for future employment, and/or for selling the trade secrets to BD competitors.

13.     BD has estimated the cost associated with developing the BD Trade Secret Information misappropriated by defendant MANIAR to be in the millions of dollars.

14.    Between in or about May 2013 and in or about June 2013, in Bergen County, in the District of New Jersey, and elsewhere, defendant

KETANKUMAR MANIAR,
a/k/a "Ketan Maniar,"

with the intent to convert trade secrets related to a product used in and intended for use in interstate and foreign commerce, namely the trade secrets described in Paragraph 7, which related to the Disposable Pen being developed by BD for pharmaceutical and healthcare applications, and with the intent to convert said trade secrets to the economic benefit of anyone other than BD, and intending and knowing that the offense would injure BD, did knowingly steal, and without authorization appropriate, take, carry away, and conceal such information, and attempt to do the same.

In violation of Title 18, United States Code, Section 1832(a)(1) and Section 1832(a)(4).

## COUNT TWO
### (Theft of Trade Secrets)

1.      Paragraph 1 of Count One of this Information is hereby incorporated and realleged as if fully set forth herein.

### Defendant MANIAR's Employment at BARD

2.      Between in or about November 2004 until his resignation on or about January 22, 2011, defendant MANIAR was employed as an engineer at BARD's Salt Lake City, Utah facility, and was responsible for developing molding processes and specifications for catheters, ports, and other medical technology products of BARD.

3.      At the commencement of his employment with BARD, defendant MANIAR signed, on or about November 18, 2004, an acknowledgment form confirming that he had reviewed BARD's Statement of Policy Concerning Confidential Information, which discussed, among other things, the protection of BARD's confidential business information.   Defendant MANIAR also signed, on or about November 18, 2004, forms acknowledging that he had read BARD's policies governing the appropriate use of technology, electronic mail, and the Internet.

4.      At the commencement of his employment with BARD, defendant MANIAR also signed, on or about November 18, 2004, the BARD Trade Secrets Agreement.   By the terms of the Agreement, defendant MANIAR acknowledged and agreed, in substance and in part, that any trade secrets or confidential information to which he had access was the property of BARD and would not be

-9-

used or disclosed to others without BARD's prior consent.

5.    The BARD Trade Secrets Agreement required, in substance and in part, that upon termination of employment, defendant MANIAR was required "to deliver promptly to [BARD] any and all unpublished memoranda, notes, records, reports, sketches, plans or other such written records whether in hard copy or computer form held by him . . . concerning any Confidential Information or pertaining to [BARD's] business or contemplated business, whether confidential or not."

## Defendant MANIAR's Theft of BARD Trade Secrets

6.    Through his employment at BARD, defendant MANIAR had access to BARD trade secret information related to the development of implantable ports, including the first port indicated for, among other things, power injection of pharmaceutical drugs, such as chemotherapy, throughout the body (collectively, the "BARD Trade Secret Information").

7.    On or about December 31, 2010, approximately one month prior to his resignation from BARD, defendant MANIAR scanned to his work email, several BARD documents containing, among other things, BARD Trade Secret Information.

8.    Around this same time period, between on or about December 1, 2010 and on or about January 22, 2011, the effective date of his resignation from BARD, defendant MANIAR downloaded numerous files from his work computer onto multiple computer storage devices, including external hard drives and

thumb drives.

9.    In addition, on or about January 21, 2011, the same day that defendant MANIAR had his exit interview, during which he affirmed, in substance and in part, that he had returned any confidential information of BARD, defendant MANIAR used his work email account to forward to his personal email account, one or more documents containing BARD Trade Secret Information and/or confidential information.

10.    As late as on or about June 3, 2013, approximately two days prior to his planned relocation to India, defendant MANIAR had in his possession, among other things, BARD files containing BARD Trade Secret Information and/or confidential information, which defendant MANIAR had stored on at least one external hard drive.   Defendant MANIAR maintained the external hard drive, along with several computers, computer storage devices, and other items, in a New Jersey hotel room where defendant MANIAR was staying prior to his impending relocation to India.

11.    The BARD Trade Secret Information that defendant MANIAR misappropriated and had in his possession in his New Jersey hotel room was economically valuable to defendant MANIAR, whether to use the trade secrets in connection with his plans to start his own medical technology firm upon his return to India, for marketing himself for future employment, and/or for selling the trade secrets to BARD competitors.

12.    BARD has estimated the cost associated with developing the BARD

Trade Secret Information misappropriated by defendant MANIAR to be in the millions of dollars.

13.    Between in or about December 2010 and in or about June 2013, in Bergen County, in the District of New Jersey, and elsewhere, defendant

KETANKUMAR MANIAR,
a/k/a "Ketan Maniar,"

with the intent to convert trade secrets related to a product used in and intended for use in interstate and foreign commerce, namely the trade secrets described in Paragraph 6, which were developed by BARD for pharmaceutical and healthcare applications, and with the intent to convert said trade secrets to the economic benefit of anyone other than BARD, and intending and knowing that the offense would injure BARD, did knowingly steal, and without authorization appropriate, take, carry away, and conceal such information, and attempt to do the same.

In violation of Title 18, United States Code, Section 1832(a)(1) and Section 1832(a)(4).

## FORFEITURE ALLEGATION

1.     The allegations contained in this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 1834 and Section 2323.

2.     Pursuant to Title 18, United States Code, Section 1834 and Section 2323, upon conviction of any of the offenses alleged in this Information, the defendant shall forfeit to the United States of America:

  a.     Any article, the making or trafficking of which, is prohibited under chapter 90 of Title 18 of the United States Code;

  b.     Any property used, or intended to be used, in any manner or part to commit or facilitate the commission of the offense; and

  c.     Any property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of the offense.

3.     If any of the property described above, as a result of any act or omission of the defendant:

  a.   cannot be located upon the exercise of due diligence;

  b.   has been transferred or sold to, or deposited with, a third party;

  c.   has been placed beyond the jurisdiction of the court;

  d.   has been substantially diminished in value; or

  e.   has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

pursuant to Title 21, United States Code, Section 853(p).


PAUL J. FISHMAN
United States Attorney

CASE NUMBER:

# United States District Court
## District of New Jersey

### UNITED STATES OF AMERICA

v.

**KETANKUMAR MANIAR,**
**a/k/a "Ketan Maniar"**

# INFORMATION FOR

18 U.S.C. § 1832(a)(1)
18 U.S.C. § 1832(a)(4)

**PAUL J. FISHMAN**
*UNITED STATES ATTORNEY, NEWARK, NEW JERSEY*

SHIRLEY U. EMEHELU
*ASSISTANT U.S. ATTORNEY*
*NEWARK, NEW JERSEY*
*973-353-6024*